STATE OF NEBRASKA, APPELLEE, V.
RODNEY MASON, APPELLANT.
709 N.W.2d 638

Filed February 3, 2006.    No. S-04-852.

Dennis R. Keefe, Lancaster County Public Defender, Andrea D. Snowden, and Ryan Esplin, Senior Certified Law Student, for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.

## NATURE OF CASE

Rodney Mason appeals his convictions and sentences in Lancaster County District Court for first degree murder and use of a deadly weapon to commit a felony. Mason assigns error to, inter alia, the trial court's refusal to give certain requested instructions with respect to the testimonies of the State's main witnesses against him and to the trial court's disposition of his challenge to the testimony of the State's firearms expert. We affirm Mason's convictions and sentences.

## STATEMENT OF FACTS

On July 31, 2003, the State filed an information charging Mason with first degree murder and use of a deadly weapon to commit a felony in connection with the April 6, 2003, shooting death of Sergio King in Lincoln. The main evidence against Mason consisted of the testimonies by three eyewitnesses: Nicole Wagy, Prentice Mason (Prentice), and Lolester Mitchell. Prentice is Mason's brother. Wagy and Prentice both generally testified that they were in Wagy's car with Mason and King when Mason shot King. Mitchell testified that he was in another car when he saw King exiting Wagy's car and saw King shot by someone from inside Wagy's car. Mitchell was unable to identify which person within Wagy's car fired the shot and was unable to identify Mason as being one of the people inside the car. The evidence at trial also included testimony by several other witnesses, including expert testimony by the forensic pathologist who performed the autopsy, which results showed that King died from gunshot wounds, and by a firearms expert from the Nebraska State Patrol who testified regarding his examination of the bullets and casings found in or near King's body.

*Testimonies of Wagy and Prentice.*

Wagy and Prentice were the two witnesses who identified Mason as the person who shot King. Wagy testified that she was at a party at Prentice's house on the night of April 5, 2003. Mason was also at the party. Mason and some other individuals

spent the night at Wagy's apartment. On the morning of April 6, Wagy decided to obtain some marijuana and she contacted King, from whom she had previously bought marijuana. Wagy drove her car to meet King, and she brought Mason with her. Wagy and Mason picked up Prentice on the way to meeting King. Mason rode in the front passenger seat of Wagy's car, and Prentice rode in the passenger's-side back seat. Wagy drove to a location where they met King. Another person was in the car with King. King did not want to stay at that location because it was near a police substation, so they drove both cars to some other locations until they arrived at the place chosen by King. King came out of his car and got into the driver's side back seat of Wagy's car. The parties in the car had a conversation regarding the purchase of marijuana, and eventually the conversation turned to a discussion of purchasing crack cocaine. At one point, Mason pulled out a gun and told King, "Break yourself." Mason then fired a shot at King, and Wagy noticed blood on King's hand. King got out of Wagy's car and ran toward his car, and Wagy drove away. Wagy did not recall hearing or seeing a second shot. She testified that she did not know that Mason was going to shoot King.

After the shooting, Wagy drove to Prentice's home, where she stayed for a while before leaving Prentice and Mason and returning to her home. She checked into a hotel that night with some friends and learned from a television news report that King had been killed. After learning of the killing, Wagy and a friend took her car to a location west of Lincoln, where they intentionally crashed and burned the car. Wagy then returned to the hotel room, where she stayed that night and where the police found her the next day and questioned her regarding King's shooting.

Prentice's testimony regarding the events of April 6, 2003, was similar to the account given by Wagy. Prentice testified that when he got into Wagy's car, he did not know there was going to be a drug transaction, and that he learned about the transaction when he heard Wagy make a call to King. Later, as Mason and King were talking about drug transactions in Wagy's car, Prentice stated that he saw Mason pull out a gun. Prentice testified that he knew Mason had a gun with him because Mason had shown it to him earlier, but Prentice stated that he did not know Mason was going to use it. Prentice stated that the gun

was a "Tech-22." Prentice next testified that he heard Mason tell King, "Break yourself." Prentice testified that "break yourself" meant that Mason was telling King to "Give me what you got. . . . Anything you have, give it to me." Prentice testified that King "looked at [Mason] funny" and that Mason then shot King in the hand. King's hand was resting on his thigh. Prentice testified that King then got out of the car and that as King was leaving the car, Mason shot at King a second time.

Prentice testified that Wagy drove the car away immediately after the shootings and that he did not know whether the second shot hit King or what happened to King after they left. According to Prentice, Wagy, Mason, and Prentice returned to Prentice's apartment, and Prentice threw the clothes he had been wearing into a Dumpster. Prentice learned that night from television news reports that King had died. After learning of King's death, Prentice asked a cousin to take him and Mason to Omaha.

Both Wagy and Prentice were contacted by police some time after King's death and each provided various different stories to police before they eventually told the version of events to which they testified at trial and which identified Mason as the shooter. These stories ranged from Prentice's initial denial of any knowledge or involvement to Wagy's identifying people other than Mason as the shooter. Both Wagy and Prentice were questioned at trial regarding their prior inconsistent statements.

During Wagy's testimony, Mason requested that a limiting instruction based on NJI2d Crim. X5.3 regarding prior inconsistent statements be read to the jury at the end of Wagy's testimony. Mason requested a similar instruction with respect to Prentice's testimony. The court denied both requests. In denying the request at the time of Prentice's testimony, the court noted that it had given an expanded introductory jury instruction at the beginning of trial regarding the evidence that can be considered in determining witness credibility and that the instruction covered significant portions of what Mason requested in this instruction. The court also gave a final jury instruction to the effect that the jury could consider prior inconsistent statements in determining the credibility of witnesses; however, the court denied Mason's request to give final jury instructions specifically naming Wagy and Prentice as witnesses whose prior

inconsistent statements could be considered in determining their credibility.

Mason also requested final jury instructions with respect to both Prentice's and Wagy's testimonies that were based on NJI2d Crim. 5.6, regarding accomplice testimony. Instead of the requested instruction, the court gave an instruction stating, "You should closely examine the testimony of . . . Wagy and Prentice . . . for any possible motive each might have to testify falsely." Mason objected to this instruction.

*Firearms Expert Testimony.*

Prior to trial, Mason filed a motion in limine seeking to prevent the State from presenting evidence "regarding firearm examination, toolmark examination, rifling characteristics examination, comparison testing or manufacturer identification completed on bullets or shell casings in this case." He asserted that such evidence did "not meet the foundation requirements set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579[, 113 S. Ct. 2786, 125 L. Ed. 2d 469] (1993) and adopted by the Nebraska Supreme Court in *Schafersman v. Agland Coop.*, 262 Neb. 215[, 631 N.W.2d 862] (2001)." Mason requested an evidentiary hearing to determine the reliability of such evidence and whether the witness who would present such testimony was an expert and would give relevant testimony. In response to the motion in limine, the court ordered the State's expert to submit himself for a deposition and ordered Mason to "file a specifications [sic] of the inadequacies of the expert's testimony in sufficient detail to permit the state to respond, together with all documentary evidence he intends to rely on and a brief in support thereof." The court further ordered the State to respond to Mason's filing, ordered Mason to file a reply to the State's response, and set a hearing date.

The State's firearms expert, Mark S. Bohaty, gave a deposition on January 16, 2004, in which he was questioned by Mason. The State was present at the deposition but did not question Bohaty. Thereafter, Mason filed a second motion in limine in which he argued, inter alia, that the evidence was not relevant because the expert could only testify as to what *might* have happened; that any probative value of the evidence would be outweighed by the

danger of unfair prejudice, because the expert's conclusions were based on conjecture; that reliability of the expert's theory and methodology had not been established, because the expert only provided his opinion as to such reliability and did not provide any documentation of testing of such reliability; and that the expert had not provided documentation to show that the instruments he used were routinely tested and assessed to ensure accuracy. At the hearing on Mason's motion in limine, the State entered into evidence the laboratory report of Bohaty's firearms testing. In addition, because Bohaty had testified at the separate trial of Mason's cousin regarding much the same matters to which Bohaty was going to testify in Mason's trial, the State offered the bill of exceptions from the cousin's trial.

On February 25, 2004, the court entered an order overruling the motion in limine. The court stated in the order, inter alia, that

the testimony Sgt. Bohaty intends to offer will address the bullets retrieved from the body of the victim in this case, . . . King, shell casings found at the scene of the shooting, the type of firearms that would make the markings found on the bullets, and a comparison of the appearance of those firearms to descriptions of the firearm used in this shooting.

Regarding Mason's challenge to the reliability of Bohaty's expert testimony, the court generally found that there was no evidence to suggest that the methodology Bohaty used to form his opinions was unreliable, that Bohaty appeared well qualified to render such opinions, that the opinions Bohaty intended to offer did not appear to overreach the techniques he used to reach his conclusions, and that the techniques he used were accepted in the firearms identification community. The court therefore denied Mason's motion in limine.

When Bohaty testified at trial, Mason renewed his objection based on the motion in limine. The court overruled the objection and noted Mason's continuing objection. Bohaty generally testified regarding his qualifications and the reliability of the methods he used to form his expert opinions. He testified that he had examined the bullets and cartridges related to King's shooting and that although he could not positively identify the bullets as having come from the same gun, the markings on the bullets were consistent with their having been fired from one gun. Bohaty also

testified that from his examination of the markings on the bullets, he determined that they had been fired from one of two types of guns, one of which was a Tech-22. Prentice had testified that Mason had a Tech-22 with him on the day of the shooting. The Tech-22 was not located. Bohaty was shown a drawing of a gun made by Wagy in which she described the gun Mason had, and Bohaty testified that the drawing was consistent with the appearance of a Tech-22.

*Testimony of Forensic Pathologist.*

During direct testimony by the forensic pathologist, Dr. Matthias Okoye, the State asked that Dr. Okoye be allowed to review his final anatomic report in order to refresh his memory. Mason had no objection upon the initial request. However, after further testimony, Mason objected, stating that Dr. Okoye was "just reading from his [final anatomic] report. He's not testifying from any independent recollection or anything like that at this time."

In connection with his contention that Dr. Okoye was reading from his report, Mason pointed to testimony in which Dr. Okoye stated that a small projectile was recovered in relation to a "gunshot wound of the left anterior thigh area," and then immediately thereafter, Dr. Okoye had corrected his statement saying "Actually, it's a typographical error. It should be right. . . . It was the right thigh. So this is, you know, [a] typographical error. . . . And then on page six, you know, instead of — instead of left it should be right, actually. On the heading should be right." The court overruled Mason's objection, stating, "Well, I'm going to let him proceed. . . . [Dr. Okoye's] not just reading out loud what his report is. . . . I think that's apparent to everybody that he's reading his report and then testifying." Mason did not make a specific objection after this ruling.

*Other Matters at Trial.*

Mason made two motions for mistrial during the course of the trial. The first motion for mistrial occurred during jury selection. Prior to jury selection, the court had granted Mason's motion to allow him to wear civilian clothing and to remove all visible restraints in order to shield the jury from the fact that Mason was

in jail during the pendency of the trial. During voir dire, jurors had been asked if they knew anyone in the courtroom. At the end of voir dire, the State asked if anyone "for whatever reason would answer something different or wants to offer any other opinions." One potential juror stated that "there is [sic] two people that have changed in this room since this morning and I do know one of them fairly close." The prospective juror stated that the person he knew was "[y]our transport jailer." The State did not pursue the issue, and the prospective juror gave no further elaboration. Immediately thereafter, the proceedings were adjourned, and after recess, before the prospective jurors returned, Mason moved for mistrial based on the potential juror's identification of a person in the courtroom as a transport jailer. The motion was denied. Further, Mason rejected the court's offer to instruct the other potential jurors to ignore the comment, reasoning that such instruction would draw their attention to the comment. Jury selection continued.

The second motion for mistrial occurred during Prentice's testimony. Prior to trial, the court had sustained a motion in limine preventing witnesses from testifying about their own or others' participation in gangs. During direct examination, the State asked Prentice why he initially lied to the police. Prentice replied that he was scared, that he was protecting his brother, and that "if — well, where I grew up, if you sit there and tell somebody it can probably mean your life." Defense counsel immediately approached the bench and moved for mistrial, arguing that Prentice's answer violated the motion in limine against testimony regarding gang affiliation. The court denied the motion for mistrial, and Prentice's testimony continued.

At the final jury instruction conference, Mason requested a lesser-included offense instruction on robbery and attempted robbery as lesser-included offenses of felony murder. The court refused the instruction.

The jury found Mason guilty of first degree murder and use of a deadly weapon to commit a felony. The court sentenced Mason to life imprisonment on the murder conviction and to a consecutive term of 10 to 25 years' imprisonment on the weapon conviction. Mason appeals.

## ASSIGNMENTS OF ERROR

Mason asserts that the court erred in (1) refusing to give his requested instructions regarding prior inconsistent statements with respect to Wagy's and Prentice's testimonies; (2) refusing to give his requested accomplice instructions with respect to Wagy's and Prentice's testimonies; (3) refusing to give a lesser-included offense instruction regarding robbery and attempted robbery; (4) overruling his motion in limine and allowing the expert testimony of Bohaty and, specifically, in placing the burden of proof on him and in giving inadequate reasoning for its ruling; (5) allowing the forensic pathologist to testify using his final anatomic report; and (6) overruling both his motions for mistrial. Mason also asserts that there was insufficient evidence to support his convictions.

## STANDARDS OF REVIEW

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. King*, 269 Neb. 326, 693 N.W.2d 250 (2005). The standard for reviewing the admissibility of expert testimony is abuse of discretion. *Id.* An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility

of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005).

█ The decision whether to grant a motion for mistrial is within the discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Van*, 268 Neb. 814, 688 N.W.2d 600 (2004).

ANALYSIS

*Prior Inconsistent Statements Instructions.*

Mason first asserts that the court erred in refusing to give his requested instructions regarding prior inconsistent statements at the time of Wagy's and Prentice's testimonies. The instructions Mason requested with respect to Wagy's testimony read as follows:

> Members of the jury, the evidence that . . . Wagy allegedly made statements that may be inconsistent with her testimony in court was brought to your attention only to help you decide if you believe what . . . Wagy testified to in court and, if so, how much to rely on that testimony. If you believe that she said something different earlier, then it will be up to you to decide if what she said here in court was true. You may not consider what may have been said earlier as proof of [Mason's] guilt or of any fact contained in those earlier statements.

Mason requested a similar instruction with respect to Prentice's testimony.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004). The parties do not appear to dispute that the proposed instructions were correct statements of the law, and as Mason notes, the instructions were based on NJI2d Crim. X5.3. It further appears undisputed that the evidence supported the

instructions because there was evidence that both Wagy and Prentice had made prior statements that were inconsistent with their testimonies at trial. Thus, resolution of this issue depends on whether Mason was prejudiced by the court's refusal to give the tendered instructions. We conclude that Mason was not prejudiced and that therefore, the court's refusal to give the instructions was not reversible error.

Mason argues that he was prejudiced by the refusal to give the instructions because it was critical to his defense to emphasize the numerous inconsistent statements made by the two witnesses whose testimonies served as evidence identifying him as the shooter. He argues that the instructions needed to be given at the time of those testimonies in order to properly focus the jury's attention on the significance of the prior inconsistent statements.

We have stated that it is not error for a trial court to refuse to give a defendant's requested instruction where the substance of the requested instruction was covered in the instructions given. *State v. Gales*, 269 Neb. 443, 694 N.W.2d 124 (2005). All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id.* In this respect, we note that in both the opening and closing instructions, the court instructed the jury regarding the use of prior inconsistent statements to assess witnesses' credibility. Ordinarily, these opening and closing instructions are sufficient. In the opening instructions, the jury was instructed that it would decide the credibility of witnesses and that in determining credibility it could consider, inter alia, "previously [sic] statements or conduct of the witness that tends to support or to contradict the witness' testimony at this trial." In the closing instructions, the court similarly instructed the jury members that they were "the sole judges of the credibility of the witnesses" and that in determining this they could consider, inter alia, "[a]ny previous statement or conduct of the witness that is consistent or inconsistent with the testimony of the witness at this trial."

Also, contrary to Mason's argument that the jury's attention was not properly drawn to the significance of the prior inconsistent statements, we note that in the cross-examinations of both

Wagy and Prentice there was substantial questioning regarding each witness' prior statements and the inconsistency of such statements when compared to their testimonies given at trial. In addition, Mason's closing arguments focused attention on Wagy's and Prentice's prior inconsistent statements. Because the substance of the requested instructions was covered in both the opening and closing instructions and because the jury's attention was directed toward the importance of the prior inconsistent statements, both in the cross-examinations and during Mason's closing arguments, we conclude that Mason has failed to demonstrate that he was prejudiced by the court's refusal to give the requested instructions at the time of Wagy's and Prentice's testimonies.

*Accomplice Instruction.*

Mason also assigns error to the court's refusal to give his requested instructions based on NJI2d Crim. 5.6, regarding accomplice testimony, with respect to both Prentice's and Wagy's testimonies. We conclude that the requested instructions were not supported by the evidence and that therefore, the court did not err in refusing to give the requested instructions.

The requested instruction with respect to Wagy read as follows:

There has been testimony from . . . Wagy, a claimed accomplice of [Mason]. You should closely examine her testimony for any possible motive she might have to testify falsely. You should hesitate to convict [Mason] if you decide that . . . Wagy testified falsely about an important matter and that there is no other evidence to support her testimony.

In any event, you should convict [Mason] only if the evidence satisfies you beyond a reasonable doubt of his guilt.

Mason requested an identical instruction with respect to Prentice's testimony. Instead of the requested instructions, the court gave an instruction stating, "You should closely examine the testimony of . . . Wagy and Prentice . . . for any possible motive each might have to testify falsely." Mason objected to the giving of this instruction.

As noted above, to establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct

statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004). We determine that the full instructions requested by Mason were not warranted by the evidence and that Mason was not prejudiced by the court's refusal to give the full instructions.

Mason points to the testimonies given by Wagy and Prentice to the effect that Mason, Wagy, and Prentice all went together to get drugs from King. Both Wagy and Prentice testified that immediately prior to shooting King in the hand, Mason said to King, "Break yourself," and Prentice testified that this statement meant that Mason was telling King to "Give me everything." Mason argues that the jury could have inferred from this that Mason was robbing King of the drugs in his possession and that the three had conspired and planned to rob King. Mason further argues that the two witnesses' status as accomplices is supported by evidence of their behavior after the shooting — both witnesses initially lied to the police regarding their involvement; Prentice threw away his clothes, which had been stained by King's blood; Wagy was attempting to hide from police when they contacted her the day after the shooting; and Wagy had burned her car, which was also stained with King's blood.

With respect to the definition of an "accomplice," this court has stated:

> " 'To constitute one an accomplice he must take some part in the crime, perform some act, or owe some duty to the person in danger that makes it incumbent on him to prevent the commission of the crime. Mere presence, acquiescence, or silence, in the absence of a duty to act, is not enough, however reprehensible it may be, to constitute one an accomplice. The knowledge that a crime is being or is about to be committed cannot be said to constitute one an accomplice . . . .' "

*State v. Sutton*, 231 Neb. 30, 45, 434 N.W.2d 689, 699 (1989) (quoting *Wilson v. State*, 170 Neb. 494, 103 N.W.2d 258 (1960). See, also, *State v. Salas*, 231 Neb. 471, 436 N.W.2d 547 (1989); *State v. Morrow*, 220 Neb. 247, 369 N.W.2d 89 (1985). Based on this definition, although there might have been evidence

that Wagy and Prentice were accomplices to an attempted drug transaction, there is no evidence that they were accomplices to an attempted robbery or to the shooting. Neither Wagy nor Prentice testified that there was a plan to rob or to kill King. Instead, they testified only that they were meeting King to purchase drugs, and they testified that they did not know Mason was going to attempt to rob or shoot King. Mason testified in his defense that he had no part in the events leading to King's death, and therefore, there was nothing in Mason's testimony which would indicate a plan between himself, Wagy, and Prentice to rob or kill King. Because there was no evidence that Wagy and Prentice were accomplices to the crimes charged in this case, the court did not err in refusing to give the entire accomplice instructions requested by Mason.

To the extent there was evidence that Wagy and Prentice tried to cover up the crime, such evidence points to their possibly being "accessories after the fact." In *State v. Quintana*, 261 Neb. 38, 621 N.W.2d 121 (2001), the defendant requested an accomplice instruction based on NJI2d Crim. 5.6. Instead, the court gave a jury instruction stating that there was evidence that the witnesses at issue were " 'accessories after the fact' " and stating that " '[y]ou should closely examine their testimony for any possible motive they might have to testify falsely.' " 261 Neb. at 45, 621 N.W.2d at 130. We acknowledged that at least one of the witnesses was arguably an accomplice rather than an accessory after the fact, and we stated, "It is the rule in this state that a defendant is entitled to a cautionary instruction on the weight and credibility to be given to the testimony of an accomplice, and the failure to give such an instruction is reversible error." *Id.* at 61, 621 N.W.2d at 139. However, in *Quintana*, we held that considering the instructions taken as a whole, the substance of the refused instruction was presented to the jury. We found it important in *Quintana* that the jury was instructed to closely examine the witnesses' testimony for any possible motive to testify falsely and that the State was required to prove each and every element of the offense charged beyond a reasonable doubt and that otherwise, the jury was to find the defendant not guilty.

In the present case, as in *Quintana*, Mason was not prejudiced by the court's refusal to give his requested instructions

because the parts of the instructions that were relevant, namely that the jury should be instructed to closely examine the witnesses' testimony for motive to testify falsely and to convict only if there is evidence beyond a reasonable doubt, were given. Instructions identifying Wagy and Prentice as "accomplices" were not necessary, nor were such instructions supported by the evidence. Therefore, the court in this case did not err in refusing to give the entire instructions requested by Mason, and we reject this assignment of error.

*Lesser-Included Offense Instruction.*

Mason asserts that the court erred in refusing to give an instruction regarding robbery and attempted robbery as lesser-included offenses of felony murder. We conclude that the evidence in this case did not produce a rational basis for acquitting Mason of felony murder and convicting him of robbery or attempted robbery and that therefore, the court did not err in refusing the instruction.

A court must instruct on a lesser-included offense if (1) the elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense. *State v. Williams*, 243 Neb. 959, 503 N.W.2d 561 (1993). With respect to whether robbery and attempted robbery are lesser-included offenses of felony murder in this case, we note that in *State v. Bjorklund*, 258 Neb. 432, 472, 604 N.W.2d 169, 207 (2000), we said:

> We have stated that a predicate felony is a lesser-included offense of felony murder for sentencing purposes, such that a defendant cannot be convicted and sentenced for both felony murder and the underlying felony without violating the Double Jeopardy Clause. See, *State v. Nissen*, 252 Neb. 51, 560 N.W.2d 157 (1997); *State v. McHenry*, 250 Neb. 614, 550 N.W.2d 364 (1996). However, we have not directly confronted the question of whether a defendant in a felony murder case may be entitled to a lesser-included offense instruction on the underlying felony.

In *Bjorklund*, we determined that we did not need to decide the issue because even if the predicate felony were a lesser-included offense, the evidence in that case did not produce a rational basis for acquitting the defendant of felony murder and convicting him of the predicate felonies and, therefore, the second prong of *Williams* was not met.

Similar to *Bjorklund*, in the present case, we need not decide whether robbery and attempted robbery are lesser-included offenses of felony murder because the evidence in this case does not produce a rational basis for acquitting Mason of felony murder and convicting him of robbery or attempted robbery. The evidence presented by the State supported a finding of felony murder. Wagy's testimony was that Mason shot King in the hand, although she was not clear on whether he fired a second shot, and Prentice's testimony was that Mason shot King in the hand and shot at him again when King left the vehicle. Although he could not identify Mason as the shooter, Mitchell testified that King was shot by a bullet fired from the car that Wagy and Prentice testified was occupied by Mason, Wagy, and Prentice. Mason's testimony in his own defense was that he was elsewhere at the time the murder was committed and that he was not involved in any of the events. Therefore, either the jury could have believed Mason's story, in which case, he would not have been found guilty of either felony murder or the predicate felony, or the jury could have believed, in whole or in part, the versions told by Wagy, Prentice, and Mitchell, in which case, Mason would be found guilty of felony murder. There was no rational basis on which the jury could have viewed the evidence presented to acquit Mason of felony murder but find him guilty of robbery or attempted robbery. Although Mason argues that the jury could have found that he attempted to rob King but that someone else, such as Mitchell, could have shot King, Mason's theories are based on speculation, there was no evidence presented to support such a finding, and, on the contrary, there was evidence that Mason shot King and that King died of gunshot wounds.

Because the evidence does not produce a rational basis for acquitting Mason of felony murder and convicting him of robbery or attempted robbery, the court did not err in refusing the

lesser-included offense instruction. We therefore reject this assignment of error.

*Challenge to Firearms Expert Testimony.*

Mason asserts that the court erred in overruling his motion in limine and allowing the testimony of the State's firearms expert, Bohaty. Mason argues that the court specifically erred by (1) putting the burden on Mason to prove the unreliability of the expert's testimony rather than putting the burden on the State to prove reliability and (2) failing in its order to give adequate analysis of its reasons for admitting the evidence. We find no merit to Mason's claims, and we conclude that the court did not abuse its discretion by admitting the testimony.

An expert's opinion is ordinarily admissible under Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1995), if the witness (1) qualifies as an expert, (2) has an opinion that will assist the trier of fact, (3) states his or her opinion, and (4) is prepared to disclose the basis of that opinion on cross-examination. *State v. King*, 269 Neb. 326, 693 N.W.2d 250 (2005). When the opinion involves scientific or specialized knowledge, this court held in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), that we will apply the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (*Daubert/Schafersman*). Under our recent *Daubert/Schafersman* jurisprudence, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. This gatekeeping function entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Schafersman, supra.*

A trial court's evaluation of the admissibility of expert opinion testimony is essentially a four-step process. *State v. Tolliver*, 268 Neb. 920, 689 N.W.2d 567 (2004). The court must first determine whether the witness is qualified to testify as an expert. It must examine whether the witness is qualified as an expert by his or her knowledge, skill, experience, training, and education. If it is necessary for the court to conduct a *Daubert* analysis, then the court must determine whether the reasoning or methodology underlying the expert testimony is scientifically valid and

reliable. To aid the court in its evaluation, the court may consider several factors, including but not limited to whether the reasoning or methodology has been tested and has general acceptance within the relevant scientific community. Once the reasoning or methodology has been found to be reliable, the court must determine whether the methodology was properly applied to the facts in issue. In making this determination, the court may examine the evidence to determine whether the methodology was properly applied and whether the protocols were followed to ensure that the tests were performed properly. Finally, the court determines whether the expert evidence and the opinions related thereto are more probative than prejudicial, as required under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995). *Tolliver, supra.*

Mason's arguments on appeal with regard to admission of the firearms expert testimony appear to focus mainly on the second step of this process, in which the court conducts a *Daubert* analysis to determine whether the reasoning or methodology underlying the expert testimony is scientifically valid and reliable. To the extent Mason challenges the court's rulings on the other steps of the process, we conclude that the foundation established by the State supported the court's conclusions that Bohaty was qualified to testify as a firearms expert, that the methodologies used by Bohaty could be applied to the evidence in this case, and that Bohaty's testimony was more probative than prejudicial.

Regarding Mason's challenges to the trial court's *Daubert* analysis, we note that the substance of Bohaty's testimony involved opinions he developed based on his examination of the casings and bullets related to the King shooting and, in particular, his examination of the markings on the bullets. From this examination, Bohaty was able to testify to his opinions regarding the type of gun or guns from which the bullets were likely fired. The *Daubert* analysis therefore was focused on the reasoning and methodologies Bohaty used to form these opinions.

Mason first argues that the court improperly conducted the *Daubert* analysis by putting the burden on him to prove that Bohaty's methodology was unreliable rather than putting the burden on the State to prove that it was reliable.

With regard to the respective burdens of the parties to a *Daubert* challenge, we have stated that "[o]nce a party opposing an expert's testimony has sufficiently called into question 'the testimony's factual basis, data, principles, [or] methods, or their application . . . the trial judge *must* determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline.'" *Zimmerman v. Powell*, 268 Neb. 422, 429, 684 N.W.2d 1, 8 (2004) (quoting *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001)). It is thus apparent that the initial task falls on the party opposing expert testimony to sufficiently call into question the reliability of some aspect of the anticipated testimony. After the factual basis, data, principles, or methods, or their application has been sufficiently called into question, then the proponent of the expert testimony has the burden of showing that the testimony is reliable. See *U.S. v. Hicks*, 389 F.3d 514 (5th Cir. 2004).

In the present case, Mason filed an initial motion in limine challenging Bohaty's testimony. The motion in limine was a general challenge which failed to specify the aspects of Bohaty's testimony that Mason asserted to be unreliable. In reaction to the initial motion in limine, the court ordered Bohaty to submit himself for deposition and ordered Mason to specify the inadequacies of the expert's testimony. The court thus aided Mason in sufficiently calling into question aspects of Bohaty's testimony.

After the deposition, Mason filed a second motion in limine, in which he asserted, inter alia, that the reliability of Bohaty's theory and methodology had not been established, because he only provided his opinion as to such reliability and did not provide any documentation of testing of such reliability. Although in his original motion in limine, Mason had made general assertions regarding reliability, in his second motion in limine, Mason specified his objections to the reliability of Bohaty's testimony to the extent that he sufficiently called reliability into question.

Contrary to Mason's argument on appeal, the court did not place the burden on him to prove that the expert testimony was unreliable. Instead, by giving Mason the opportunity to depose Bohaty and by directing him to specify his objections to Bohaty's testimony, the court was guiding Mason in meeting his initial burden to sufficiently call some aspect of the expert testimony into

question. After Mason had done so in the second motion in limine, the State then had the burden of showing that the testimony was reliable. The State undertook to meet this burden by entering into evidence, in addition to Bohaty's deposition taken by Mason, the laboratory report of Bohaty's testing in this case and the bill of exceptions from the trial of Mason's cousin, at which trial, Bohaty testified to the same matters to which he was going to testify in Mason's trial. Bohaty's testimony at the cousin's trial included testimony which provided foundation with regard to Bohaty's qualifications as well as the reliability of the methodology he used to form his opinions. The burden was on the State to establish reliability, and in its order overruling Mason's motion in limine, the court determined that the State had met its burden.

With respect to the court's order, Mason argues that the court failed to give adequate analysis of its reasons for admitting the expert testimony of Bohaty. Mason relies on *Zimmerman v. Powell*, 268 Neb. 422, 684 N.W.2d 1 (2004), in which this court concluded in a jury trial that because the trial court failed to explain its reasoning, the court had abdicated its gatekeeping duty under *Daubert/Schafersman*. Compare *State v. Fernando-Granados*, 268 Neb. 290, 682 N.W.2d 266 (2004) (extensive findings in nonjury case demonstrated gatekeeping duty performed). We stated in *Zimmerman* that a court

> adequately demonstrates that it has performed its gatekeeping duty when the record shows (1) the court's conclusion whether the expert's opinion is admissible and (2) the reasoning the court used to reach that conclusion, specifically noting the factors bearing on reliability that the court relied on in reaching its determination.

268 Neb. at 430-31, 684 N.W.2d at 9. We concluded in *Zimmerman* that the record included the court's conclusions, but lacked analysis. We elaborated, stating:

> The court should have explained why [the expert's] trial testimony was sufficient to show that [the scientific method he used] and the manner in which he used it were reliable. For example, if the court believed that [the method] was reliable because [the expert] suggested that it was widely accepted as quality software within the engineering community, it should have said so.

268 Neb. at 435, 684 N.W.2d at 12.

In the present case, the court in its order gave reasons why it found that Bohaty's testimony was reliable. Although the court's analysis was not as extensive as might have been appropriate in a more complicated case, given the subject matter at issue, the court's analysis was adequate. In *Zimmerman*, we acknowledged that the *Daubert* model recognizes that "a range of reasonable methods exists for distinguishing reliable expert testimony from false expertise." 268 Neb. at 429, 684 N.W.2d at 8. We further noted that "the trial court has considerable discretion in deciding what procedures to use in determining if an expert's testimony satisfies *Daubert/Schafersman*" and that "[t]he trial court's discretion further extends to deciding what factors are reasonable measures of reliability in each case." *Id.*

The type of ballistics and firearms testimony that Bohaty presented in this case was not novel and is fairly routine in cases involving the use of firearms. Therefore, the *Daubert* analysis did not need to be as extensive as it might have been if the testimony involved more complicated, less routine methods of testing. In *State v. Leibhart*, 266 Neb. 133, 144, 662 N.W.2d 618, 628 (2003), with respect to a *Daubert* challenge to expert testimony regarding shaken baby syndrome, we stated:

> We note that the evidence presented at the *Daubert* hearing in this case was not extensive and consisted mainly of [the expert's] testimony and his reference to the relevant literature. However, the level of inquiry in a *Daubert* hearing may vary depending on the nature of the expert testimony challenged, and the inquiry in the present case was appropriate and sufficient. As we stated in *Schafersman* [*v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001)], *Daubert* "does not require that courts reinvent the wheel each time that evidence is adduced." 262 Neb. at 228, 631 N.W.2d at 874.

We noted in *Leibhart* that expert testimony regarding shaken baby syndrome had been previously admitted by courts in this state and that courts in other states had found such testimony reliable. We further stated:

> General acceptance is one of several factors that may be considered to determine the reliability of expert testimony.

In this regard, we note that a reexamination under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), is most appropriate "where recent developments raise doubts about the validity of previously relied-upon theories or techniques." *Schafersman*, 262 Neb. at 228, 631 N.W.2d at 874.

*Leibhart*, 266 Neb. at 144, 662 N.W.2d at 628.

Similar to the expert testimony in *Leibhart*, the type of ballistics and firearms testimony to which Bohaty testified in this trial has commonly been admitted in this state. See, *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998); *State v. Kula*, 252 Neb. 471, 562 N.W.2d 717 (1997); *State v. Perrigo*, 244 Neb. 990, 510 N.W.2d 304 (1994); *State v. Carter*, 241 Neb. 645, 489 N.W.2d 846 (1992); *State v. Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990); *State v. Trevino*, 230 Neb. 494, 432 N.W.2d 503 (1988). Expert testimony similar to that given in this case has been found reliable under a *Daubert* analysis in other jurisdictions. See *U.S. v. Hicks*, 389 F.3d 514, 526 (5th Cir. 2004) (stating that "[w]e have not been pointed to a single case in this or any other circuit suggesting that the methodology employed by [the government's ballistics expert] is unreliable"). See, also, *U.S. v. Foster*, 300 F. Supp. 2d 375 (D. Md. 2004), and cases cited therein.

In a case involving a more novel methodology or a methodology which had been more significantly called into question, a more extensive inquiry and more extensive analysis and reasoning would have been indicated. Considering the nature of the expert testimony involved in this case, we conclude that the court's inquiry, analysis, and ruling with respect to Mason's challenge were adequate and that the court did not abuse its discretion in admitting Bohaty's expert testimony. See *State v. King*, 269 Neb. 326, 693 N.W.2d 250 (2005) (admissibility of expert testimony reviewed for abuse of discretion). We therefore reject Mason's assignments of error with respect to the admission of Bohaty's testimony.

*Testimony of Forensic Pathologist.*

Mason asserts that the court erred in overruling his objection to the testimony of the forensic pathologist, Dr. Okoye. Mason objected on the basis that Dr. Okoye was "just reading from his

[final anatomic] report. He's not testifying from any independent recollection or anything like that at this time." We conclude that the record indicates that Dr. Okoye was not merely reading from his report and that therefore, the court did not err in overruling Mason's objection.

In support of his assertion that it was error for the court to allow Dr. Okoye to testify by reference to his prepared notes under the guise of refreshing his recollection, Mason cites *Hall v. American Bakeries Co.*, 873 F.2d 1133 (8th Cir. 1989). Although the Court of Appeals for the Eighth Circuit in *Hall* found the use of notes to be error, the court noted that "[n]o foundation was laid regarding [the witness'] need to refresh his memory or whether the notes would be of assistance." 873 F.2d at 1136. Likewise, in *Baker v. Boren*, 129 Idaho 885, 893, 934 P.2d 951, 959 (Idaho App. 1997), also cited by Mason, the court concluded that "the proper foundation for use of [a witness'] notes was not laid." In the present case, Mason makes no argument with regard to foundation and it appears from the record that proper foundation was made that Dr. Okoye needed to refresh his memory and that the report would help him do so. Although the cases indicate that it was error for the court to allow a witness with no independent recollection to simply read from notes, the record in this case does not indicate that Dr. Okoye simply read from his report. We further note that Mason did not move to strike Dr. Okoye's testimony, nor does he direct us on appeal to portions of the testimony which should have been excluded as prejudicial.

When overruling Mason's objection, the court in this case stated that "Dr. Okoye's not just reading out loud what his report is." For support of his contention that Dr. Okoye was simply reading from the report, Mason points to testimony in which Dr. Okoye states that a small projectile was recovered in relation to a "gunshot wound of the left anterior thigh area" and then immediately thereafter amends the statement saying, "Actually, it's a typographical error. It should be right. . . . It was the right thigh. So this is, you know, [a] typographical error. . . . And then on page six, you know, instead of — instead of left it should be right, actually. On the heading should be right." The portion of the record highlighted by Mason does not indicate that Dr.

Okoye was simply reading his report into the record; to the contrary, the witness' correction of the report indicates that he was testifying from present recollection rather than merely from reading the report.

The trial court observed Dr. Okoye's testimony and stated that Dr. Okoye was not merely reading from his report, and our review of the record does not contradict this statement but instead indicates that Dr. Okoye was testifying from his independent recollection as evidenced by his correcting portions of the report. We therefore conclude that the court did not err in overruling Mason's objection, and we reject this assignment of error.

*Motions for Mistrial.*

Mason asserts that the court erred in denying both motions for mistrial that he made during the course of the trial. We conclude that the court did not abuse its discretion in denying either motion.

The decision whether to grant a motion for mistrial is within the discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Van*, 268 Neb. 814, 688 N.W.2d 600 (2004). A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *Id.*

The first motion for mistrial occurred during jury selection when a potential juror stated that he knew a person in the courtroom and that the person was "[y]our transport jailer." Mason moved for mistrial on the basis that the potential juror's comment could prejudice the other jurors. Mason argued that the comment violated the spirit of rulings that had been issued prior to trial allowing Mason to wear civilian clothing and to remove all restraints except a leg restraint while in court. Mason argued that the object in granting such motions was to shield the jury from the knowledge that Mason was in jail during trial, because such knowledge would be prejudicial to his defense. The court overruled the motion for mistrial.

We conclude that the court did not abuse its discretion in denying the first motion for mistrial. The prospective juror's statement

that he recognized a person in the courtroom as a transport jailer was not a statement that Mason was known to be incarcerated, and in any event, we cannot say that the comment would have prejudiced the jury with respect to its task of fairly weighing the evidence. The State did not further question the prospective juror, and he did not further elaborate. The challenged comment was fleeting and did not violate the specific pretrial rulings.

The second motion for mistrial occurred during Prentice's testimony when Prentice stated that he had originally lied to the police because "if — well, where I grew up, if you sit there and tell somebody it can probably mean your life." Mason argued that the comment violated an order granting a motion in limine preventing witnesses from testifying about their own or others' participation in gangs. The court denied Mason's motion for mistrial.

We conclude that the court did not abuse its discretion in denying Mason's second motion for mistrial. Prentice's comment, "where I grew up," did not violate the motion in limine against testimony regarding gang affiliation. Fear of reprisal for testifying could be a concern whether or not in reference to gang activity, and Prentice's expression of such fear would not necessarily be understood as testimony regarding gang activity.

We note that with regard to the prospective juror's comment in this case, Mason declined the court's offer to give an instruction at the time. Furthermore, with respect to both incidents in this case, neither incident required an instruction or admonition because neither comment was so prejudicial that it could have prevented a fair trial. In *State v. McLemore*, 261 Neb. 452, 466, 623 N.W.2d 315, 327 (2001), we concluded that the court did not abuse its discretion in not granting a motion for mistrial based on a "vague statement [that] did not inform the jury" of potentially prejudicial information. There was no mention in *McLemore* that any admonition or instruction was made with respect to the statement. Similarly, in the present case, the statements upon which Mason moved for mistrial did not, as Mason argues, inform the jury of potentially prejudicial information and therefore, there was no need for an admonition or instruction. Furthermore, if the court had instructed on either incident in this case, it would merely have served to draw the jury's

attention to the comments and raised questions in the jurors' minds regarding the meaning and importance of the comments.

We conclude that the court did not abuse its discretion in overruling the motions for mistrial, and we reject this assignment of error.

*Sufficiency of Evidence.*

Finally, Mason asserts that the evidence was not sufficient to support his convictions for first degree murder and use of a deadly weapon to commit a felony. We conclude that the evidence in this case was sufficient to support Mason's convictions.

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Sanders*, 269 Neb. 895, 697 N.W.2d 657 (2005).

Mason asserts that the only direct evidence of his guilt were the testimonies of Wagy and Prentice. He argues that because their testimonies were "unbelievable," they lacked sufficient probative force for the jury to find him guilty beyond a reasonable doubt. Mason posits that it is possible that Wagy or Prentice committed the murder or that they conspired together and blamed Mason for the killing in order to lessen their punishment. Mason contends that because of Wagy's and Prentice's inconsistent statements and their potential motives to lie, this court should conclude that their testimonies lacked sufficient probative force as a matter of law and that therefore, there was not sufficient evidence to convict Mason.

The issue of the witnesses' credibility was to be decided by the jury, and if the jury believed their testimonies, there was sufficient evidence to support Mason's conviction. As noted above, in reviewing a conviction, this court does not pass on the

credibility of witnesses because such matters are for the finder of fact. *Sanders, supra.* Mason's argument hinges on his proposal that this court should conclude as a matter of law that Wagy's and Prentice's testimonies were unreliable; under the standard of review recited above, we will not do so. The jury was presented with evidence from which it could assess the witnesses' credibility. Despite their inconsistent prior statements and their potential motives, about which the jury was made aware, the jury was properly permitted to believe Wagy's and Prentice's testimonies to the effect that Mason shot King, and such testimonies, along with the other evidence presented, including evidence that King died from gunshot wounds, provided sufficient evidence on which to convict Mason. We therefore reject this assignment of error.

## CONCLUSION

Having rejected each of Mason's assignments of error, we affirm his convictions and sentences.

AFFIRMED.