278 Neb. 342
STATE OF NEBRASKA, APPELLEE,
v.
ANTONIO BANKS, APPELLANT.
No. S-07-670.
Supreme Court of Nebraska.
Filed August 21, 2009.
Dennis R. Keefe, Lancaster County Public Defender, and Shawn Elliott for appellant.
Jon Bruning, Attorney General, and James D. Smith for appellee.
WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ., and INBODY, Chief Judge.
MILLER-LERMAN, J.

NATURE OF CASE
Antonio Banks was convicted of first degree murder and use of a firearm to commit a felony in connection with the August 30, 2005, shooting death of Robert Herndon. The district court for Lancaster County sentenced Banks to life imprisonment on the first degree murder conviction and to a consecutive sentence of imprisonment for 20 to 30 years on the firearm conviction. Banks appeals. We affirm Banks' convictions and sentences.

STATEMENT OF FACTS
Banks was charged in connection with the death of Herndon, who died as the result of gunshot wounds to the chest in the early hours of August 30, 2005, in Lincoln, Nebraska. Various witnesses at Banks' trial testified regarding the events of the evening of August 29 and the early hours of August 30.
Amanda Herman was Herndon's girlfriend. Herman testified that she spent the evening of August 29, 2005, at Herndon's house watching a movie with Herndon and a friend of Herndon's. At the end of the evening, Herndon gave his friend a ride home and Herman remained at Herndon's house. Shortly after Herndon and his friend left, Herman heard a knock at the door. She opened the door and saw a man later identified as Victor Young. Young told her that his car had broken down, and he asked whether he could have a jug of water. A second man whom Herman had not seen at first pushed past Young and came into the house. He was wearing a shirt or mask over his face and carrying a shotgun. Although Herman was unable to identify the second man, Young's testimony identified Banks as the second man. Banks pointed the gun at Herman's chest and told her to get into a bathroom that was near the front door. Herman went into the bathroom, and someone closed the door behind her.
While she was in the bathroom, Herman heard the men going through the house searching cupboards and drawers and knocking things around. Young asked her where Herndon was, and she told him he had gone to take a friend home. Banks asked Herman "more than a couple" of times "where the money was at, where is the weed at." At one point, Herman responded that he should look in the closet. One of the men came and took her out of the bathroom so that she could show them the closet. She then returned to the bathroom. Shortly thereafter, she heard Banks say "jack pot."
Herman then heard keys in the front door and heard Herndon enter the house and call for her. She did not respond, but she heard a sound of scuffling and heard Herndon say "you cracked me in the head." One of the men asked Herndon where the money and marijuana were, and Herndon responded, "I don't have anything, here's my wallet." Herman heard Banks say "let's bring [Herman] out here and kill her in front of him and then maybe he'll talk, maybe he'll tell us." Herman then heard what sounded like someone falling down the stairs, and she heard Banks say "stay downstairs or I'm going to kill you, don't call the cops." Thereafter, she heard what sounded like someone trying to come up the stairs and Banks saying "don't keep coming back up here, stay down there." She heard Herndon more than once say, "Get out . . . of my house." She also heard two loud bangs that she thought sounded like someone hitting something.
After several minutes, things quieted down and Herman thought the men had gone, so she came out of the bathroom. She called out for Herndon but got no response, so she went to the basement and through the house and the backyard looking for him. As she went through the house, she saw that it had been "ransacked," with drawers pulled out and things strewn on the floor. When she could not find Herndon, she grabbed her keys and went to her car, which was parked in the driveway. As she backed out of the driveway, she saw Herndon lying in the street by the curb. She got out of the car and ran to Herndon and discovered that he was bleeding and was lying on top of his shotgun. A neighbor told her that they had heard gunshots and that the police were on their way.
The first police officer who arrived at the scene testified at trial that he heard the dispatcher's report of the shooting at 12:26 a.m. on August 30, 2005, and that he arrived on the scene at 12:31 a.m. The officer saw Herndon's body lying in the street along the curb with a shotgun partially visible under his body. The officer saw no signs of life.
Herman was not able to identify Banks as one of the men; however, she testified that she had met Banks approximately 1 month before Herndon's shooting. She met him through Ella Durham, a friend of hers who was Banks' girlfriend, and she had seen him a few times that month. Herman testified that on one occasion, Banks and Durham came to Herndon's house to retrieve from Herman a purse that Durham had left in Herman's car. Herman testified, however, that she did not think Banks and Herndon had ever met.
Durham testified that she had previously spent the night of August 26, 2005, at Herndon's house with Herman and Herndon. The next morning, Durham saw a friend of Herndon's grab a bag of marijuana from a closet in Herndon's house. Herman told Durham that she had seen seven or eight bags of marijuana in the closet. That afternoon, Durham told Banks that Herndon had "seven or eight pounds" of marijuana in his house. Banks responded by wondering "how much they were selling it for."
Herman was able to identify Young from a photograph as being the first man at the door on the night Herndon was killed. Young testified at trial that on the evening of August 29, 2005, he was driving around Lincoln. At approximately 10 p.m., he received a call from Banks, whom Young had known since they played football together in their teens. Banks asked Young to pick him up at the corner of Eighth and C Streets. When Young picked up Banks, Banks told Young that he wanted to get some money to get out of town because he had a court case pending. Banks told Young he had an idea that he could "get fronted" an amount of marijuana from someone and that instead of paying that person back, he would take whatever money he could get for the marijuana and leave town. After Young and Banks drove around for a time, Young received a call from John Montgomery, a person to whom Young sold crack cocaine. Young drove to Montgomery's location and sold him drugs. Montgomery asked if he could ride with Young and hang out, and Young agreed. Banks was in the passenger seat, and Montgomery got into the back seat behind Banks.
Shortly thereafter, Banks asked Young to drive to the place where they could pick up the marijuana. Banks directed Young to Herndon's house. When they reached the house, Banks asked Young whether he had a shotgun that Banks knew Young wanted to sell with him. Banks said that he might be able to sell the gun to the man in the house. Young told Banks the gun was in the trunk. Banks told Montgomery to stay in the car and that they would not be long. Young and Banks went to the trunk, and Banks grabbed the shotgun and a towel in which the shotgun was wrapped. The two went to the door of Herndon's house, and Banks told Young that he should go ahead to the door and ring the doorbell. After Young rang the doorbell, he saw Banks come from around the side of the house with the towel wrapped around his head and holding the shotgun in front of him. Young testified that when a woman answered the door, Banks directed him to tell her that his car had died. Banks then pointed the shotgun at the woman and entered the house.
Young testified that he did not know what Banks had planned to do and that he was in shock and simply followed along as Banks entered the house, guided the woman into the bathroom, and started going through the house. Young testified that Banks told him to ask the woman where the marijuana was located. Young stayed in the front hallway as Banks went through the rooms of the house. Young eventually heard some music from outside and heard Banks say "jackpot." Banks came back toward the front door and pushed Young into an adjoining room. Young heard Herndon come into the house calling for Herman. Young then heard, but did not see, Banks jump Herndon. Young heard Banks repeatedly asking Herndon where the marijuana was and telling Herndon to "[s]top coming up the stairs." Young also heard Banks say that "maybe if we pulled [Herman] out of the bathroom, she'll tell us  or you'll tell us then where [it] is at." Young heard Herndon responding that he did not have anything and that Banks should just go.
Young eventually left the adjoining room and went into the front hallway and saw Banks standing at the door to the basement. Young ran out of the house after he saw Banks holding a handgun and kicking the door to the basement. Young ran to the car and saw Banks run out of the house. As Banks was getting into the passenger seat of the car, Herndon came out of the house carrying a shotgun pointed at the car and saying things like "come rob, come rob me." Young saw that Herndon had blood on his face. Banks got out of the car and pointed his handgun at Herndon and told him to "put the gun down or I'll shoot." Herndon kept coming toward Banks with the shotgun pointed down, and Banks shot Herndon twice with his handgun. Banks and Young both got back into the car. Young saw Herndon continue coming toward Banks after he had been shot, but Herndon fell down as Young drove the car away.
Montgomery testified at trial that he was waiting in the car outside Herndon's house and saw Young sprint out of the house to the car acting "[f]rantic, nervous, scared." Montgomery then saw Banks jog out of the house to the passenger side of the car. Banks stopped getting into the car when Herndon ran out of the house carrying a shotgun and bleeding from the head. Herndon came up to Banks at the side of the car, and the two yelled at each other and went into the street. Montgomery did not see Herndon point the shotgun at Banks; instead, Herndon held the shotgun "military style" across his chest. Montgomery heard Banks tell Herndon twice to put the gun down, and then he saw Banks shoot Herndon twice with a chrome 9-mm handgun.
Young testified that after leaving Herndon's house, he drove Banks and Montgomery to Young's apartment complex. During the ride, Young asked Banks why he shot Herndon, and Banks denied that he had shot him. Upon arriving at the apartment complex, Young told Banks he needed "to go, get away from me, you know, get out of here." Banks got out of the car and made some telephone calls. Eventually, Young saw a car drive up to Banks. Young identified the driver of the car as Charles Bowling. Young knew Bowling because Young had played on a basketball team with his son. Banks got into the car with Bowling, and they drove into the parking lot of a grocery store near Young's apartment complex. Young saw the two get out of the car, and they appeared to argue. Young yelled to them that they needed to leave.
Bowling testified at trial that he knew Banks because Banks and his family attended his church and Banks had gone to school with his sons. Banks had called Bowling in the early hours of August 30, 2005, and asked him to come pick him up at a grocery store parking lot. Bowling initially resisted, but Banks persisted in calling and was "very stressed and very agitated," so Bowling went to pick him up. Bowling reached the parking lot between 1:45 and 2 a.m. Banks got into Bowling's car "very hastily and very agitated" and told Bowling he needed to get away quickly. Bowling took Banks to Bowling's apartment. Banks told Bowling that he had done "something bad" and needed to leave town. Banks stayed at the apartment for a half hour to an hour before he called someone and left. Banks later returned and took a shower. Banks asked Bowling for some clothes, and Bowling gave him a new shirt. Bowling testified that 2 or 3 days later, he threw away the shirt that Banks had originally been wearing. Banks stayed at Bowling's apartment for 2 to 3 hours after he returned. Banks requested money, and Bowling gave him between $35 and $45. Banks left the apartment when a young woman driving a van came to pick him up. Three or four days later, Bowling learned from a newspaper article that Banks had been involved in a homicide.
Parrish Casebier testified that he first met Banks on the morning of August 31, 2005. Casebier knew of Banks through Casebier's girlfriend and Banks' stepbrother. Banks came to Casebier's house to show him a 9-mm handgun, because Banks knew that Casebier had a friend in Kansas City interested in buying guns. Casebier and Banks discussed a trip that Casebier was planning to take to Houston, Texas, and Casebier and Banks agreed that Banks would go along. That afternoon, Banks, Casebier, and two women left for Houston in a van that belonged to one of the women.
On the return trip from Houston, they stopped in Kansas City on September 2, 2005. Casebier testified that he had been receiving calls from the husband of the woman who owned the van wanting to know where the van was. While in Kansas City, Casebier told Banks to return the van to Lincoln. Banks told Casebier that he did not want to go back to Lincoln because he had "hurt somebody really bad" and he did not know "whether he was dead or alive." Casebier testified that he did not see Banks again after that night.
Banks was arrested in Lincoln on September 3, 2005. The State filed an information charging Banks with first degree murder and use of a weapon to commit a felony. In charging first degree murder, the information stated that Banks killed Herndon "purposely and with deliberate and premeditated malice" or that he killed Herndon "in the perpetration of or attempt to perpetrate any robbery, or kidnapping." Prior to trial, the court granted the State's motion to strike the reference to kidnapping from the first degree murder charge. In the weapon charge, the original information stated that Banks "did use a knife or any other deadly weapon to commit" first degree murder. During jury selection, the State moved for leave to amend the weapon count to allege that Banks used a firearm to commit a felony, rather than that he used "a knife or any other deadly weapon." Banks objected to the amendment. The court overruled the objection but told the State the appropriate time to amend would be at the close of evidence. After the State rested its case, and over Banks' objection, the court gave the State leave to amend the information.
Prior to trial, Banks filed a motion to change venue asserting that he could not obtain a fair and impartial trial because of pretrial publicity. In support of the motion, Banks offered 16 newspaper articles about his involvement in the present case and two additional cases. One case involved a fatal car accident in February 2005; in connection with the accident, Banks had pled no contest to manslaughter. The other case was a home invasion robbery carried out by Banks and Young that occurred August 21, approximately 1 week before the incident in the present case. As part of a plea agreement, Young pled guilty to robbery in the August 21 incident and pled guilty to a reduced charge of manslaughter in connection with Herndon's death. The oldest of the 16 newspaper articles was dated February 17, 2005, and the most recent was dated February 21, 2007, less than 1 week before jury selection began in this case. The court took the motion to change venue under advisement, pending jury selection. At the end of voir dire but prior to the exercise of peremptory challenges, and again at the conclusion of the alternate juror selection, Banks renewed his motion to change venue. The court overruled the motion both times.
Jury selection began on the morning of February 26, 2007. During voir dire, Banks moved to strike four potential jurors for cause. In a questionnaire sent to potential jurors, each of the four had circled "Yes" to the question whether they had formed or expressed an opinion on the guilt or innocence of Banks. The court questioned each of the potential jurors, and during such questioning, each of the four expressed that he or she could set aside any previously formed opinion and could decide the case based on the evidence at trial. The court overruled Banks' motions to strike the four potential jurors for cause.
Banks also moved to strike a potential alternate juror for cause because during individual voir dire, she recalled reading about Banks' involvement in the fatal car accident. The court overruled Banks' motion to strike the potential alternate juror and noted that she stated that all she remembered was that an accident had occurred and that she did not remember anything else, such as the fact that Banks had been prosecuted and sentenced in connection with the accident. None of the potential jurors or alternate jurors of whom Banks complained ultimately sat on the jury. Although the record is not clear on this point, Banks asserts that he used his peremptory strikes on the challenged potential jurors and potential alternate juror.
Trial included the testimony of the witnesses described above. Additional evidence included testimony by several other witnesses, including a pathologist who testified that the cause of Herndon's death was two gunshot wounds to the chest. Physical evidence included a shotgun recovered from Young's car and which Young identified as the shotgun that Banks carried into the house. Analysis of blood found on the end of the shotgun revealed the presence of Herndon's DNA. The handgun used to shoot Herndon was not found, but two shell casings were found at the scene and were identified as being from a 9-mm handgun.
During his testimony at trial, Bowling stated that he was testifying under a use immunity order issued pursuant to Neb. Rev. Stat. § 29-2011.02 (Reissue 2008). Prior to Bowling's testimony, Banks made an offer of proof that Young would testify that Banks had once told him that Bowling "smoked crack." The court sustained the State's objection to the offer of proof on the basis of foundation and hearsay.
During Bowling's testimony, Banks made another offer of proof in the form of a deposition in which Bowling stated that he had undergone drug counseling and treatment in 2006 because he had "struggled with" the drug crack for 1 year prior to treatment. Bowling denied buying drugs from or using drugs with Banks. Banks argued that he should be allowed to cross-examine Bowling regarding his drug use in order to support a theory that Young and Bowling were involved in drug transactions and that such involvement gave both witnesses motive to give false testimony. The court sustained the State's objections to Banks' offer of proof on the basis of foundation, relevance, and speculation.
At the close of the State's evidence, Banks moved the court to dismiss the charges against him on the basis that the testimonies of Young, Montgomery, Casebier, and Bowling were unreliable. The court overruled the motion. In his defense, Banks called three members of the police department and questioned them about the investigation. The court instructed the jury that the purpose of such testimony was to impeach the testimonies of Montgomery and Young. Banks did not testify. At the close of all evidence, Banks moved for dismissal or directed verdict, again arguing unreliable testimony. The court overruled the motion.
At the jury instruction conference, the State requested that the court instruct on both premeditated murder and felony murder theories of first degree murder. Banks also requested that the court instruct on both theories and further requested that the court instruct on second degree murder and manslaughter as lesser-included offenses. The court, however, determined that the evidence supported only an instruction on felony murder. The court therefore refused instructions on premeditated murder, second degree murder, and manslaughter. When the court stated that it would instruct only on felony murder, Banks requested an instruction on robbery and attempted robbery as lesser-included offenses of felony murder. The court refused the instruction.
Banks also requested a self-defense instruction. The court refused on the basis that self-defense is not a defense to felony murder. Banks argued that whether or not he actually presented or argued a theory of self-defense, an instruction was supported by the evidence, particularly testimony by Montgomery and Young to the effect that Herndon was advancing on Banks with a shotgun when Banks shot him.
The court refused other instructions proposed by Banks. Banks requested, but the court refused to give, an instruction on abandonment as an affirmative defense. The court also refused an instruction regarding Bowling's testimony. The requested instruction noted that Bowling had been given immunity and would have instructed that the jury "should consider that testimony with greater caution than that of other witnesses."
The court gave an instruction regarding accomplice testimony that referred to Montgomery and Young as claimed accomplices of Banks. Banks had requested an accomplice testimony instruction that also referred to Casebier and Bowling. The State objected to the inclusion of Casebier and Bowling, arguing that although they might be accessories after the fact, they were not accomplices. The court agreed and refused to include Casebier and Bowling in the accomplice instruction.
Following deliberations, the jury returned unanimous verdicts finding Banks guilty of first degree murder and of use of a firearm to commit a felony. The court sentenced Banks to life imprisonment for first degree murder and a consecutive sentence of imprisonment for 20 to 30 years on the firearm conviction.
Banks appeals.

ASSIGNMENTS OF ERROR
Banks asserts that the district court erred when it (1) overruled his motions to strike for cause the four potential jurors and the potential alternate juror challenged by Banks; (2) overruled his motion to change venue; (3) refused to instruct the jury on premeditated murder and the lesser-included offenses of second degree murder and manslaughter; (4) refused to instruct on robbery and attempted robbery as lesser-included offenses of felony murder; (5) refused his proposed instruction on the affirmative defense of abandonment; (6) refused his proposed instruction on self-defense; (7) prohibited him from cross-examining Bowling regarding drug use, in violation of the Confrontation Clause; (8) refused to include Casebier and Bowling in the accomplice testimony instruction; (9) refused to give his proposed immunity instruction regarding Bowling's testimony; (10) allowed the State to amend the weapon charge in the information to specify that a firearm had been used; and (11) overruled his motion to dismiss.

STANDARDS OF REVIEW
[1] The retention or rejection of a venireperson as a juror is a matter of discretion with the trial court and is subject to reversal only when clearly wrong. State v. Hessler, 274 Neb. 478, 741 N.W.2d 406 (2007).
[2] A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse of discretion. Id.
[3] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. Id.
[4] An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause and reviews the underlying factual determinations for clear error. State v. Jacobson, 273 Neb. 289, 728 N.W.2d 613 (2007).
[5] The decision to grant or deny an amendment to a pleading rests in the discretion of the court. State v. Molina, 271 Neb. 488, 713 N.W.2d 412 (2006).
[6] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. State v. McGhee, 274 Neb. 660, 742 N.W.2d 497 (2007).

ANALYSIS

The District Court Did Not Commit Reversible Error When It Overruled Banks' Motions to Strike Jurors for Cause.
Banks asserts that the district court erred when it overruled his motions to strike four potential jurors and one potential alternate juror for cause. We conclude that because none of the challenged potential jurors became part of the jury, the court did not commit reversible error when it overruled Banks' motions.
Banks argues that four potential jurors should have been struck because they circled "Yes" to a question on the juror questionnaire regarding whether they had formed an opinion on Banks' guilt or innocence. He argues that the potential alternate juror should have been struck because during voir dire, she admitted she had heard that Banks had been involved in a fatal car accident in March 2005. Banks asserts that because the court did not sustain his motions, he had to use his peremptory strikes on the challenged persons.
[7] We have stated that "`the erroneous overruling of a challenge for cause will not warrant reversal unless it is shown on appeal that an objectionable juror was forced upon the challenging party and sat upon the jury after the party exhausted his or her peremptory challenges.'" State v. Hessler, 274 Neb. 478, 496, 741 N.W.2d 406, 421 (2007) (quoting State v. Quintana, 261 Neb. 38, 621 N.W.2d 121 (2001)). None of the potential jurors challenged by Banks in this case actually sat on the jury. Under Hessler and Quintana, there can be no reversal based on a challenge to a potential juror if that person was not ultimately included on the jury, even if the defendant was required to use a peremptory challenge to remove the person. No biased juror sat on Banks' case, and in terms of due process and the constitutional right to a jury trial, Banks received what the law provides. Our decision is consistent with Rivera v. Illinois, ___ U.S. ___, 129 S. Ct. 1446, 173 L. Ed. 320 (2009).
We conclude that reversal is not warranted in this case based on the court's overruling of Banks' motions challenging potential jurors where such potential jurors did not ultimately become members of the jury.

The District Court Did Not Err When It Overruled Banks' Motion for a Change of Venue Because Banks Did Not Establish That a Change of Venue Was Necessary for a Fair Trial.
Banks next asserts that the district court erred when it overruled his motion for a change of venue. Banks argues that a change of venue was required because of pretrial publicity. We conclude that Banks has not established that a change of venue was necessary and that the court did not abuse its discretion by denying the motion.
The only evidence Banks offered in support of his motion for a change of venue consisted of 16 newspaper articles that appeared in the Lincoln Journal Star between February 2005 and February 2007. The articles reported on Banks' alleged involvement in this case and in two other casesone involving a fatal car accident, and one involving a home invasion robbery that occurred 1 week before the incident in this case.
In support of his argument that pretrial publicity required a change of venue, Banks notes that during voir dire, seven potential jurors were struck for cause. However, it does not appear from the record that the strikes were related to bias resulting from pretrial publicity.
Banks directs our attention to the five potential jurors he challenged for cause as discussed in connection with his first assignment of error. He argues that the voir dire of each of these potential jurors indicated that they were influenced by pretrial publicity. Although each of these potential jurors stated that he or she had seen newspaper articles about Banks, each also stated that he or she could be impartial despite what he or she had read. The court apparently accepted these statements and believed these persons could be impartial despite the newspaper articles when it overruled Banks' challenges to such potential jurors. Furthermore, as noted above, none of these potential jurors actually sat on the jury.
In State v. Hessler, 274 Neb. 478, 741 N.W.2d 406 (2007), and in State v. Quintana, 261 Neb. 38, 621 N.W.2d 121 (2001), we noted that the record in each case showed that although potential jurors had heard publicity about the case, such potential jurors agreed that they could make decisions based solely on what they heard in court rather than what they had previously heard about the case. We further noted in both Hessler and Quintana that an impartial jury had ultimately been chosen, and we concluded that the defendant in each case had not shown that he could not receive a fair trial in the county at issue and that the court did not abuse its discretion in denying the defendant's motion to change venue.
Similar to Hessler and Quintana, we determine that Banks has not shown that a change of venue was necessary. The potential jurors who admitted reading the newspaper articles did not become members of the jury. Banks did not show that the jury actually selected was biased by pretrial publicity, and because an impartial jury was selected, Banks did not show that it was impossible to seat an impartial jury or that he could not receive a fair trial in Lancaster County.
We therefore conclude that the court did not abuse its discretion when it overruled Banks' motion for a change of venue.

The District Court Did Not Err and Did Not Violate Banks' Right of Due Process When It Refused to Instruct on Premeditated Murder and Its Lesser-Included Offenses; Banks Was Not Prejudiced by the Refusal to Instruct on Premeditated Murder, and the Evidence Did Not Produce a Rational Basis to Acquit Banks of Felony Murder and Convict Him of Second Degree Murder or Manslaughter.
Banks asserts that the district court erred when it refused to instruct on the premeditated murder theory of first degree murder and on the associated lesser-included offenses of second degree murder and manslaughter. We conclude that the district court did not err when it refused the instructions, because Banks was not prejudiced by the refusal to instruct on premeditated murder, and the evidence did not produce a rational basis to acquit Banks of first degree murder under a felony murder theory and convict him of second degree murder or manslaughter.
At the jury instruction conference, the State requested that the court instruct on both premeditated murder and felony murder as alternate theories of first degree murder. Banks also requested that the court instruct on both theories, and he further requested that the court instruct on second degree murder and manslaughter as lesser-included offenses of first degree premeditated murder. The court, however, determined that the evidence supported an instruction on only the felony murder theory of first degree murder. The court therefore refused instructions on premeditated murder and the lesser-included offenses of second degree murder and manslaughter.
Banks makes a two-step argument as to why the court erred in refusing to instruct on premeditated murder: First, he claims that the court should have instructed on premeditated murder because the instruction was supported by the evidence and, second, he claims that his due process rights were violated because the jury was not allowed to consider lesser-included homicide offenses and was forced to choose between either convicting him of first degree murder or acquitting him.
We first consider the court's refusal to instruct on premeditated murder. To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. State v. Hessler, 274 Neb. 478, 741 N.W.2d 406 (2007). With respect to the requirement that the appellant must show that he or she was prejudiced by the court's refusal to give an instruction, we note that premeditated murder and felony murder are not separate offenses but are alternate theories of first degree murder. See, State v. Brouillette, 265 Neb. 214, 655 N.W.2d 876 (2003) (crime of first degree murder constitutes one offense even though there may be alternative theories by which criminal liability for first degree murder may be charged and prosecuted); State v. Nesbitt, 264 Neb. 612, 633, 650 N.W.2d 766, 785 (2002) ("premeditated murder and felony murder are simply alternate methods of committing first degree murder"). Without regard to whether an instruction on premeditated murder was supported by the evidence, Banks cannot show that he was prejudiced by the court's refusal to give an instruction on the theory of premeditated murder, because such an instruction would only have provided the jury with an additional route to convict him of first degree murder. To the extent that the court's refusal to give the premeditated murder instruction minimized the ways by which the jury could find Banks guilty of first degree murder, such refusal did not prejudice Banks.
Although he acknowledges that a premeditated murder instruction would have increased the theories under which the jury could have found him guilty of first degree murder, Banks nevertheless argues that he was prejudiced by the refusal to give the premeditated murder instruction, because it deprived him of the jury's potential consideration of the offenses of second degree murder and manslaughter which are lesser-included offenses of premeditated murder. We note that while second degree murder and manslaughter may be lesser-included offenses of first degree murder under a premeditated murder theory, they are not lesser-included offenses of first degree murder when it is charged and tried under a felony murder theory. See State v. Bjorklund, 258 Neb. 432, 447, 604 N.W.2d 169, 192 (2000) ("[w]e have repeatedly held that Nebraska law provides no lesser-included homicide offenses to felony murder"). Because the court determined that the evidence warranted an instruction on only the felony murder theory of first degree murder, it would not and did not instruct on the lesser homicide offenses because they are not lesser-included offenses to felony murder.
[8] With respect to lesser-included offenses, we have held that a court must instruct on a lesser-included offense if (1) the elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense. State v. Sinica, 277 Neb. 629, 764 N.W.2d 111 (2009). In the present case, the "greater offense" is first degree murder whether under a premeditated murder theory or a felony murder theory. The district court refused the lesser-included offense instruction on second degree murder and manslaughter because the court determined that the evidence supported a conviction for only first degree murder under a felony murder theory. Considering the evidence, the court in effect determined that the evidence could support a finding of guilty of first degree murder under a felony murder theory, but the evidence could not support a rational basis for acquitting Banks of first degree murder under a felony murder theory and instead convicting him of second degree murder or manslaughter.
Banks argues that the court's refusal to instruct on the lesserincluded offenses was contrary to Beck v. Alabama, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), in which the U.S. Supreme Court held that it is a violation of a defendant's due process rights if a jury is not given an option to convict a defendant of any lesser-included offense that is supported by the evidence rather than being given an "all or nothing" option either to convict the defendant of a capital offense or to find the defendant not guilty. In State v. Bjorklund, supra, we noted that Beck was predicated on the rule that a defendant is entitled to a lesser-included offense instruction if the evidence would permit a jury rationally to acquit the defendant of the greater offense and find the defendant guilty of the lesser offense. In Bjorklund, we concluded that because the evidence did not so permit, it was not a due process violation under Beck when the court refused a lesser-included offense instruction.
Similarly, in the present case, we conclude that whether or not the court instructed on first degree murder under a premeditated murder theory, the evidence did not produce a rational basis for acquitting Banks of first degree murder under a felony murder theory and instead convicting him of second degree murder or manslaughter. If the court had instructed on both theories of first degree murder, the jury would have to have acquitted Banks under both theories before it could reach and convict him of second degree murder or manslaughter. Therefore, although second degree murder and manslaughter are not lesser-included offenses of felony murder, it is appropriate for us to consider for completeness of our analysis whether there was a rational basis to have acquitted Banks of felony murder and otherwise convicted him of either of the lesser offenses.
The evidence presented by the State supported a finding of felony murder. The evidence in this case included the testimonies of Young, Herman, and Montgomery regarding the events connected to the attempted robbery and the shooting of Herndon. Taken together, such evidence indicates that Banks took part in a robbery or attempted robbery of Herndon's house and that in the perpetration of that crime, Herndon was shot and killed by Banks. The jury could have either accepted or rejected the testimony indicating that Banks was part of the entire incident. If the jury believed Young's and Montgomery's identification of Banks as the person who forced his way into Herndon's house and later shot Herndon, then the jury would find Banks guilty of felony murder. If the jury believed the two witnesses were mistaken or lying about Banks' involvement in the robbery or attempted robbery, the jury would find him not guilty of felony murder.
There is no evidence that would give the jury a rational basis to find that Banks was guilty of second degree murder or manslaughter but acquit him of felony murder. In order to convict Banks of second degree murder or manslaughter, the jury would have to find that Banks killed Herndon. In order to convict Banks of second degree murder or manslaughter but acquit him of first degree murder under a felony murder theory, the jury would have to find that Banks killed Herndon but that he did not do so in the perpetration of or the attempt to perpetrate a robbery. There was no evidence in this case to support a finding that Banks killed Herndon but that the killing was not in the perpetration of the robbery or the attempted robbery.
Banks argues that the robbery or attempted robbery ended as soon as he reached the car and that a new incident started when Herndon came at him with the shotgun and he got back out of the car to confront Herndon. He asserts that the jury could have found that at the time Banks shot Herndon, the robbery or attempted robbery had been completed, and that therefore, Herndon was not killed in the perpetration of or the attempt to perpetrate a robbery but instead he was killed in a separate confrontation that occurred after the course of the robbery or attempted robbery was completed. Banks' suggestion is not consistent with the evidence.
The evidence indicated that Herndon was killed as Banks and Young were getting away. The getting away was an integral part of the unfolding perpetration of the robbery or attempted robbery. There is no evidence of a separation in time or distance from the perpetration or attempted perpetration of a robbery such that the jury could find that Herndon's killing was not part of the perpetration or attempted perpetration.
We conclude that Banks has not established reversible error from the court's refusal to instruct on premeditated murder and the lesser-included offenses of second degree murder and manslaughter. In this case, Banks was convicted of first degree murder based on sufficient evidence. Banks has shown no prejudice from the refusal to instruct on premeditated murder, because such instruction would have simply given the jury an additional theory under which to convict Banks of first degree murder. Banks also has not shown that he was prejudiced by the failure to instruct on premeditated murder with its corresponding lesser-included offenses, because the evidence did not produce a rational basis to acquit him of first degree murder under a felony murder theory but convict him of second degree murder or manslaughter. The district court therefore did not violate Banks' right to due process and did not otherwise prejudicially err when it refused to give the instructions requested by Banks.

The District Court Did Not Err When It Refused a Lesser-Included Offense Instruction on Robbery and Attempted Robbery Because the Evidence Did Not Produce a Rational Basis to Acquit Banks of Felony Murder and Convict Him of Robbery or Attempted Robbery.
Banks asserts that the district court erred when it refused to give an instruction on robbery and attempted robbery as lesserincluded offenses of felony murder. We conclude that the court did not err when it refused to give the lesser-included offense instruction because the evidence in this case did not produce a rational basis to acquit Banks of felony murder and convict him of robbery or attempted robbery.
With respect to whether robbery and attempted robbery are lesser-included offenses of felony murder, we note that in both State v. Mason, 271 Neb. 16, 709 N.W.2d 638 (2006), and State v. Bjorklund, 258 Neb. 432, 604 N.W.2d 169 (2000), although we stated that a predicate felony is a lesser-included offense of felony murder for sentencing purposes, we did not directly confront the question of whether a defendant in a felony murder case may be entitled to a lesser-included offense instruction on the underlying felony.
In both Mason and Bjorklund, we determined that it was not necessary to decide the issue, because even if the predicate felony were a lesser-included offense, the evidence in each case did not produce a rational basis for acquitting the defendant of felony murder and convicting him of the predicate felonies, and therefore, the court was not required to instruct on the underlying felonies even if they were lesser-included offenses.
Similar to Mason and Bjorklund, in the present case, we need not decide whether robbery and attempted robbery are lesser-included offenses of felony murder, because the evidence in this case does not produce a rational basis for acquitting Banks of felony murder and convicting him of only robbery or attempted robbery. The evidence presented by the State supported a finding of felony murder. Such evidence included the testimonies of Young, Herman, and Montgomery regarding the events connected to the attempted robbery and the shooting of Herndon. Taken together, such evidence indicates that Banks took part in a robbery or attempted robbery of Herndon's house and that in the perpetration of that crime, Herndon was shot and killed.
The jury could have accepted or rejected the testimony indicating that Banks took part in the robbery. If the jury believed Young's and Montgomery's identification of Banks as the person who forced his way into Herndon's house and later shot Herndon, then the jury would rationally find Banks guilty of felony murder. If the jury believed that the two witnesses were lying or mistaken about Banks' involvement in the robbery or attempted robbery, the jury would find Banks was not involved in the robbery and find him not guilty of felony murder. Under the evidence presented, which showed that Herndon's death was an incident of the robbery, there was no rational basis upon which the jury could find that Banks was guilty of the robbery or attempted robbery but was not guilty of felony murder. Based on the evidence, the jury had to find either that Banks was guilty of felony murder or that he was not guilty of any crime.
Similar to his argument above with regard to the lesser-included homicide offenses, Banks also argues that the court's failure to instruct on robbery and attempted robbery as lesser-included offenses of felony murder violated his due process rights, contrary to the holding in Beck v. Alabama, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980). For the same reason we rejected the argument in connection with the lesser-included homicide offenses, we reject the argument here. In this case, as in Bjorklund, Banks' arguments regarding Beck and due process are unavailing, because the evidence does not support a finding to acquit Banks of felony murder but convict him solely of robbery or attempted robbery.
Because the evidence does not produce a rational basis for acquitting Banks of felony murder and convicting him of robbery or attempted robbery, we conclude that the court did not err when it refused to give the lesser-included offense instruction requested by Banks.

The District Court Did Not Err When It Refused to Give Banks' Proposed Instruction on the Affirmative Defense of Abandonment Because the Evidence Did Not Support the Defense.
Banks asserts that the district court erred when it refused his requested instruction regarding the affirmative defense of abandonment. We conclude the court did not err, because the evidence did not support the instruction.
Banks requested an instruction on abandonment as an affirmative defense that read:
In regard to the offense of first degree murder, second degree murder, and manslaughter, abandonment of a criminal enterprise is a defense to said charge if you find that . . . Banks abandoned or withdrew from the robbery or attempted robbery of . . . Herndon, and that an appreciable interval of time elapsed prior to killing . . . Herndon.
The court refused the instruction.
Banks argues that he abandoned the robbery and was leaving the house when Herndon came out of the house and confronted him. He cites to, inter alia, State v. Wilson, 192 Neb. 435, 222 N.W.2d 128 (1974), to support his argument that an abandonment defense instruction was appropriate in this case.
We conclude that the facts of this case do not support an abandonment defense. In Wilson, this court stated:
To be effective as a defense, there must be an appreciable interval between the alleged abandonment of the criminal enterprise and the act for which responsibility is sought to be avoided. The coconspirator must have a reasonable opportunity to follow the example and refrain from further action before the act in question is committed. A conspirator cannot escape responsibility for an act which is the natural result of a criminal scheme he has helped to devise and carry forward by running away at the instant when the act in question is about to be committed and the transaction which immediately begets it has actually been commenced.
192 Neb. at 437, 222 N.W.2d at 130. In Wilson, the defendant argued that he had abandoned a planned robbery before coconspirators threw the victim into the river, resulting in the victim's drowning death.
In the present case, there is no evidence to support a finding that Banks abandoned the robbery or attempted robbery before the crime was committed. Instead, the evidence indicates that the robbery was ongoing and not completed before Banks left the premises. Although Banks argues it is possible that the robbery was aborted because Banks and Young did not find the items for which they were looking, the evidence shows that the robbery was not abandoned and was still in progress at the time of the shooting. The evidence in this case was that Banks shot Herndon while Banks was escaping. Such evidence does not support an abandonment defense.
We conclude that the district court did not err when it refused to give Banks' proposed instruction on the affirmative defense of abandonment because the evidence did not support the instruction.

The District Court Did Not Err When It Refused Banks' Self-Defense Instruction Because Banks Did Not Offer Evidence to Support a Self-Defense Theory.
Banks asserts that the district court erred when it refused his self-defense instruction. We note that the district court rejected the instruction on the basis that self-defense is not a defense to felony murder. Without commenting on whether such basis was proper, and notwithstanding our conclusion above that this case forms the basis for felony murder, for completeness, we consider Banks' self-defense assignment of error and conclude that the court did not err when it refused the instruction, because self-defense was not Banks' theory of the case and he did not meet the initial burden of proving self-defense.
In State v. Faust, 265 Neb. 845, 660 N.W.2d 844 (2003), disapproved on other grounds, State v. McCulloch, 274 Neb. 636, 742 N.W.2d 727 (2007), we concluded that the trial court erred when it gave a self-defense instruction that was inconsistent with the defendant's theory of the case. We stated:
[W]hen the defendant makes no effort to meet the initial burden of proof to prove self-defense and when self-defense is not the defendant's theory of the case, a self-defense instruction is not warranted. A theory of self-defense necessarily involves an inference or admission that the defendant harmed the victim, but that the defendant's acts were justified. By giving a self-defense instruction when the defendant's theory of the case is that he or she did not commit the crime, the court risks confusing or misleading the jury.
State v. Faust, 265 Neb. at 879, 660 N.W.2d at 874.
In the present case, the only evidence to which Banks points to support a theory of self-defense is evidence presented by the State. He notes that Montgomery's and Young's testimonies indicated that Herndon was coming at Banks with a shotgun when he shot Herndon, and he argues that such evidence supports a self-defense instruction. However, Banks offered no evidence in his defense to support a theory of self-defense. Instead, Banks' defense strategy was to attack the credibility of the witnesses against him and to infer that the witnesses conspired to frame him for a crime he did not commit. There is no indication that Banks inferred or admitted that he had harmed Herndon but that his acts were justified as self-defense.
In Faust, the issue was whether the court erred in giving a self-defense instruction and whether trial counsel was ineffective for failing to object to such instruction. We concluded in Faust that it was error to give the instruction and that it was deficient and prejudicial for counsel to fail to object, because the instruction confused and misled the jury as to the defendant's theory of defense.
The present case differs from Faust because Banks requested the instruction and the court refused to give it. However, the rationale for the holding in Faust is also applicable in this case.
Self-defense is a statutorily defined affirmative defense in Nebraska. State v. Iromuanya, 272 Neb. 178, 719 N.W.2d 263 (2006). Neb. Rev. Stat. § 28-1409 (Reissue 2008) provides in pertinent part:
(1) . . . [T]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
(4) The use of deadly force shall not be justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily harm, kidnapping or sexual intercourse compelled by force or threat, nor is it justifiable if:
(a) The actor, with the purpose of causing death or serious bodily harm, provoked the use of force against himself in the same encounter; or
(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a right thereto or by complying with a demand that he abstain from any action which he has no duty to take . . . .
To successfully assert the claim of self-defense, one must have a reasonable and good faith belief in the necessity of using force, and the force used in defense must be immediately necessary and must be justified under the circumstances. State v. Iromuanya, supra.
We recognize that there was evidence that Herndon was walking toward Banks with a shotgun before Herndon was shot. Banks' theory of defense was essentially that he did not shoot Herndon, and therefore, Banks presented no evidence to support a finding that he had a reasonable and good faith belief that he needed to use force or that the force he did use in his defense was immediately necessary and was justified under the circumstances. Banks did not testify, as was his right. As a result, he did not admit that he shot Herndon and he did not present evidence that he reasonably believed that such use of force was necessary for him to defend himself. Instead, the manner of the presentation of his defense indicates that Banks' theory of defense was that he did not shoot Herndon and that the witnesses against him were not credible.
Because there was not evidence to support a claim of selfdefense in this case and because a self-defense instruction would have misled or confused the jury, the district court did not err when it refused to give the requested instruction.

The District Court Did Not Violate Banks' Constitutional Right to Confrontation When It Sustained the State's Objections to Banks' Proposed Cross-Examination of Bowling Regarding Drug Use.
Banks next asserts that the district court erred when it refused to permit him to cross-examine Bowling regarding his drug use, because limiting the cross-examination violated his rights under the Confrontation Clause. We conclude that the court did not err in sustaining the State's objections to such cross-examination and that the limiting of cross-examination did not violate Banks' constitutional right to confrontation.
During Young's testimony, which occurred prior to Bowling's testimony, Banks made an offer of proof that Young would testify that he had seen Bowling a few times in 2005 and that Banks had once told Young that Bowling "smoked crack." The court sustained the State's objection to the offer of proof on the basis of foundation and hearsay. During Bowling's testimony, Banks made another offer of proof in the form of Bowling's deposition in which Bowling stated, inter alia, that he had undergone drug counseling and treatment in 2006 because he had "struggled with" the drug crack cocaine for 1 year prior to treatment. Banks argued that he should be allowed to cross-examine Bowling regarding his drug use in order to support a theory that Young and Bowling were connected through the drug trade and that such connection gave both witnesses motive to lie in their testimonies. Banks also argued that Young's testimony that he had seen Bowling a few times in 2005 contradicted Bowling's testimony that he had not seen Young for several years before he saw him on August 30, 2005, and that such inconsistency would have led the jury to believe that Bowling was lying. The court sustained the State's objections to Banks' offer of proof on the basis of foundation, relevance, and speculation. The court stated that the fact Young sold crack cocaine to others did not prove he sold it to Bowling and that Young's testimony that he saw Bowling a few times in 2005 did not mean the two talked or that Bowling saw Young on those occasions.
[9, 10] Banks asserts on appeal that the court's refusal to allow cross-examination of Bowling regarding his drug use violated Banks' right to confront witnesses. An accused's constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of a witness, or (2) a reasonable jury would have received a significantly different impression of the witness' credibility had counsel been permitted to pursue his or her proposed line of cross-examination. State v. Schmidt, 276 Neb. 723, 757 N.W.2d 291 (2008). Although the main and essential purpose of confrontation is the opportunity of cross-examination, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based upon concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. State v. Schmidt, supra.
Banks asserts that cross-examination of Bowling regarding his drug use would have shown his bias and would have given the jury a significantly different impression of his credibility. He argues that the jury could have inferred that Young was Bowling's crack dealer and that the jury could have inferred that Young, Montgomery, Casebier, and Bowling were all connected through the drug trade and that such connection motivated each of them to protect the person who actually killed Herndon by supporting the story that Banks shot and killed Herndon.
We conclude that Banks' right of confrontation was not violated in either of the ways set forth above. The first type of violation refers to a court's prohibiting "otherwise appropriate cross-examination" designed to show bias. The court in this case sustained the State's objections to the proposed cross-examination based on foundation, hearsay, and relevance. If such objections were valid, then the cross-examination was not "otherwise appropriate." Banks makes no argument that the objections were without merit other than his argument that limiting cross-examination violated his right to confrontation. We find no error in the court's sustaining the objections. The proposed cross-examination was not "otherwise appropriate," and Banks' confrontation rights were not violated when his cross-examination was limited based on such objections.
The proposed cross-examination also would not have given the jury "a significantly different impression of the witness' credibility." There was no evidence in Banks' offers of proof that Young was Bowling's dealer or that Bowling was connected with Young or any of the other witnesses through the drug trade. Although there was evidence that Young sold drugs, neither Young nor Bowling testified that Young sold drugs to Bowling. Young also testified that he had seen Bowling a few times recently, but Young did not testify that Bowling saw him or that he sold crack to Bowling on those occasions. Banks' argument that the addition of evidence of Bowling's drug use would have altered the jury's assessment of his credibility depended on significant speculation that Bowling was connected to Young, Montgomery, and Casebier through the drug trade. The district court observed that such inferences seemed "pretty farfetched." We cannot say that the district court's assessment was in error. We conclude that cross-examination regarding Bowling's drug use and Young's having seen Bowling a few times in 2005 would not have given the jury a significantly different impression of Bowling's credibility.
We conclude that the district court did not err when it sustained the State's objections to Banks' proposed cross-examination of Bowling and that limiting such cross-examination did not violate Banks' constitutional right of confrontation.

The District Court Did Not Err When It Refused to Include Casebier and Bowling in the Accomplice Testimony Instruction Because the Evidence Did Not Show That They Were Accomplices and the General Witness Credibility Instruction Adequately Covered Their Testimonies.
Banks asserts that the district court erred when it refused to include Casebier and Bowling in the accomplice testimony instruction. We conclude that the court did not err because the evidence did not indicate Casebier and Bowling were accomplices in the commission of the crime and they were adequately covered by the general witness credibility instruction.
In State v. Mason, 271 Neb. 16, 29, 709 N.W.2d 638, 650-51 (2006), we noted that an accomplice
"'"must take some part in the crime, perform some act, or owe some duty to the person in danger that makes it incumbent on him to prevent the commission of the crime. Mere presence, acquiescence, or silence, in the absence of a duty to act, is not enough, however reprehensible it may be, to constitute one an accomplice. The knowledge that a crime is being or is about to be committed cannot be said to constitute one an accomplice . . .
In Mason, we noted that while certain witnesses might be considered accessories after the fact because there was evidence that they tried to cover up the crime, such witnesses were not "accomplices" and that therefore, an instruction identifying such witnesses as "accomplices" was not necessary. General instructions to the effect that the jury should "closely examine the witnesses' testimony for motive to testify falsely and to convict only if there is evidence beyond a reasonable doubt" were given in Mason, 271 Neb. at 31, 709 N.W.2d at 651, and we conclude that such instructions were sufficient.
Similarly in the present case, the evidence indicates that Casebier and Bowling may have been accessories after the fact but there was no evidence that they were "accomplices" as described above. There was no evidence that either person took part in the commission of the robbery that led to Herndon's death. Banks' argument that the two were accomplices is based on a complicated theory that because Casebier and Bowling were each, to some extent, allegedly involved in the drug trade, it was possible that they were associates of Montgomery and Young and that some combination of Young, Montgomery, Casebier, and Bowling actually committed the robbery and shooting and then conspired to frame Banks for the shooting. Banks' theory requires considerable speculation based on tenuous connections, and the evidence does not support an implication that either Casebier or Bowling was an accomplice to the robbery.
Also, the court in this case gave a reasonable doubt instruction and a general instruction regarding the credibility of witnesses. In Mason, we considered it important that although the witnesses at issue were not identified as "accomplices," the jury was instructed to "closely examine the witnesses' testimony for motive to testify falsely and to convict only if there is evidence beyond a reasonable doubt." 271 Neb. at 31, 709 N.W.2d at 651 (citing State v. Quintana, 261 Neb. 38, 621 N.W.2d 121 (2001)). In the present case, the jury was instructed to convict only if there was evidence beyond a reasonable doubt. The witness credibility instruction in the present case did not specifically instruct the jury to consider "motive to testify falsely," but it did instruct the jury to consider "interest or lack of interest of the witness in the result of this case," "apparent fairness or bias of the witness, or the witness' relationship to the parties," and any "other evidence that affects the credibility of the witness."
Given the limited extent of Casebier's and Bowling's involvement in the events at issue, the court did not err when it did not include them in the accomplice instruction; the general witness credibility instruction was sufficient to instruct the jury on its duty to assess their testimonies. We find no merit to this assignment of error.

The District Court Did Not Err When It Refused Banks' Proposed Instruction Regarding the Immunity Given to Bowling Because the Instruction Was Not a Correct Statement of Law and Banks Has Not Shown That He Was Prejudiced by the Refusal.
Banks asserts that the district court erred when it refused his proposed instruction regarding the immunity given to Bowling and the effect of such immunity on Bowling's credibility. We conclude that the court did not err when it refused the instruction, because Banks' proposed instruction was not a completely correct statement of the law and the substance of the instruction was adequately covered by the witness credibility instruction given by the court.
At the beginning of his testimony, Bowling stated that he was testifying under a use immunity order issued pursuant to § 29-2011.02. Bowling later testified he understood that because of the immunity, his testimony in this trial could not be used against him. At the jury instruction conference, Banks requested an instruction that read as follows:
You have heard testimony from . . . Bowling who has received immunity. That testimony was given in exchange for a promise by the State of Nebraska that his testimony will not be used against him in any future prosecution.
In evaluating . . . Bowling's testimony, you should consider whether that testimony may have been influenced by the State's promise of immunity given in exchange for it, and you should consider that testimony with greater caution than that of other witnesses.
The court refused the instruction.
To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. State v. Hessler, 274 Neb. 478, 741 N.W.2d 406 (2007). Although Banks' proposed instruction may have been warranted by the evidence in this case, we conclude that the instruction was in part not a correct statement of the law and that Banks has not shown that he was prejudiced by the court's refusal to give the instruction.
[11] We note first that the proposed instruction is not a correct statement of law in that it instructs the jury that it "should consider [Bowling's] testimony with greater caution than that of other witnesses." A witness' credibility and weight to be given to testimony are matters for determination and evaluation by a fact finder. State v. Schreiner, 276 Neb. 393, 754 N.W.2d 742 (2008). It was the jury's duty in this case to determine Bowling's credibility and the weight to be given his testimony, and therefore, it would have been improper for the court to instruct that his testimony should be considered "with greater caution than that of other witnesses."
In this respect, the proposed instruction went beyond the general witness credibility instruction, NJI2d Crim. 5.2, which highlights certain factors that the jury "may consider" in assessing credibility but which stresses that the jury is "the sole judge" of credibility and the weight to be given testimony. Similarly, the accomplice testimony instruction, NJI2d Crim. 5.6, instructs that the jury "should closely examine [an accomplice's] testimony for any possible motive . . . to testify falsely." However, while these instructions highlight matters for the jury to consider in its evaluation of a witness' credibility, they do not instruct the jury to consider a particular witness' testimony "with greater caution than that of other witnesses." This phrase could signal to the jury that the witness is less credible than the other witnesses and that the witness' testimony should be given less weight than that given to the testimony of other witnesses.
[12] Furthermore, even if the instruction were a correct statement of law to the extent it merely highlighted a matter for the jury to consider in assessing witness credibility, Banks has not shown that he was prejudiced by the court's refusal to give the proposed instruction, because the court gave a general instruction regarding witness credibility which adequately covered the matter. The court gave an instruction which followed the pattern instruction NJI2d Crim. 5.2, "Evaluation of Testimony Credibility of Witnesses." The court instructed:
You are the sole judges of the credibility of the witnesses and the weight to be given to their testimony. In determining the weight which the testimony of the witnesses is entitled to receive, you should consider:
....
8. Any other evidence that affects the credibility of the witness or that tends to support or contradict the testimony of the witness.
It is not error for a trial court to refuse to give a party's requested instruction where the substance of the requested instruction was covered in the instructions given. State v. Iromuanya, 272 Neb. 178, 719 N.W.2d 263 (2006).
At trial, the court refused Banks' request to the effect that if his proposed immunity instruction was not given, the general witness credibility instruction include, as one of the factors to consider, "the fact that a witness is granted immunity." However, the immunity issue was adequately covered in the general instruction, because the jury was instructed to consider, inter alia, "[a]ny other evidence that affects the credibility of the witness." In this regard, we note that in the comment to NJI2d Crim. 5.2, the Nebraska Supreme Court Committee on Pattern Jury Instructions stated that the "other evidence" under numbered paragraph 8 includes evidence of "other specific instances of possible bias (such as a grant of immunity to a testifying witness)." The committee further stated in the comment that the reference to "other evidence" in paragraph 8 should be "sufficient as instruction to the jury and that a focus on particular instances regarding the possibility of bias more properly is left for highlighting by argument by counsel."
In this case, we believe that the reference in paragraph 8 to "other evidence" affecting credibility was sufficient to instruct the jury that it might consider evidence regarding immunity given to Bowling as a matter affecting his credibility and that the possibility of bias arising from such matter was better left for argument by counsel. The record shows that in closing arguments, Banks' counsel referred to Bowling's immunity and argued that Bowling "testified because the [S]tate promised that whatever he said on that witness stand[, the State] would not use to prosecute him."
We further note that the possibility of bias arising from a grant of immunity is a matter that is particularly better left for argument by counsel because it is arguable whether immunity makes testimony less credible or more credible. One could argue that a grant of immunity would seem to bolster a witness' credibility, because he or she can tell the truth without being concerned that his or her testimony will be used against him or her in a subsequent prosecution except that the witness could be prosecuted for perjury if he or she gave false testimony. Therefore, it is better that immunity be considered one of the types of "other evidence" affecting credibility that a jury is instructed it may consider rather than that the jury be instructed, as Banks requested in this case, that immunity means that the witness' testimony should be considered "with greater caution than that of other witnesses." Instead, the jury should be allowed, as it was in this case, to consider the fact of immunity and make its own determination whether such fact makes the witness' testimony more or less credible than the testimony of other witnesses.
Banks' proposed instruction regarding the immunity given to Bowling was not a completely correct statement of the law, and Banks has not shown that he was prejudiced by the district court's refusal to give the instruction. We therefore conclude that the court did not err in refusing to give the proposed instruction.

The District Court Did Not Err When It Allowed the State to Amend the Information With Regard to the Weapons Charge Because the Amendment Did Not State an Additional or Different Offense and Banks' Substantial Rights Were Not Prejudiced.
Banks next asserts that the district court erred when it allowed the State to amend the information to change the charge of using a weapon to commit a felony to specify that Banks used a firearm. We conclude that the court did not err in allowing the amendment, because the amendment did not state an additional or different offense and Banks was not prejudiced by the amendment.
The original information filed by the State alleged that Banks used "a knife or any other deadly weapon" to commit a felony. The caption of the information indicated that Banks was being charged with use of a weapon to commit a felony pursuant to Neb. Rev. Stat. § 28-1205 (Reissue 2008) and that the charge was a Class III felony. The information was amended to state that Banks used "a firearm" to commit a felony, and the caption was amended to indicate that the charge was a Class II felony.
[13] A trial court, in its discretion, may permit a criminal information to be amended at any time before verdict or findings if no additional or different offense is charged and the substantial rights of the defendant are not prejudiced. See, State v. Aldrich, 226 Neb. 645, 413 N.W.2d 639 (1987) (citing State v. Gascoigen, 191 Neb. 15, 213 N.W.2d 452 (1973)). In the present case, the State moved to amend the information during jury selection and the court allowed the State to make the amendment at the close of the State's evidence and prior to submission of the case to the jury. The court therefore had discretion to allow the amendment, provided that (1) no additional or different offense was charged and (2) Banks' substantial rights were not prejudiced.
Banks notes that under § 28-1205, use of a weapon other than a firearm is a Class III felony, whereas use of a firearm is a Class II felony. He argues that because the classification of the offense and the potential penalties are different depending on whether the weapon is a firearm, amending the information to specify that the weapon is "a firearm" rather than "a knife or any other deadly weapon" is an amendment in which a different offense is charged.
We note that § 28-1205(1) provides as follows:
Any person who uses a firearm, a knife, brass or iron knuckles, or any other deadly weapon to commit any felony which may be prosecuted in a court of this state or who unlawfully possesses a firearm, a knife, brass or iron knuckles, or any other deadly weapon during the commission of any felony which may be prosecuted in a court of this state commits the offense of using a deadly weapon to commit a felony.
A distinction between firearms and other weapons is made in § 28-1205(2), wherein the statute provides that use of a deadly weapon other than a firearm is a Class III felony and that use of a deadly weapon which is a firearm is a Class II felony. Section 28-1205 defines a single offense of "using a deadly weapon to commit a felony" but classifies the offense differently depending on the type of weapon used. Therefore the amendment to the information in this case did not charge a different offense; the offense with which Banks was charged was still the offense of "using a deadly weapon to commit a felony." The amendment specified that the weapon was a firearm and therefore changed the classification of the offense, but it did not state an additional or different offense.
Because the amendment did not state an additional or different offense, the court had discretion to allow the amendment so long as Banks' substantial rights were not prejudiced. We conclude that there was no prejudice to Banks because it was clear throughout pretrial proceedings that the weapon used in the incident was a firearm. There was no evidence that a knife was used to kill Herndon, and there were several references not repeated here to firearms at pretrial proceedings. The original information made Banks aware that he was being charged with the offense of using a deadly weapon to commit a felony under § 28-1205, and the evidence was clear that the deadly weapon that was used was a firearm. Banks has not shown that his substantial rights were prejudiced by the amendment.
We conclude that the district court did not err when it allowed the State to amend the information.

The District Court Did Not Err When It Overruled Banks' Motion to Dismiss.
Banks finally asserts that the district court erred when it overruled his motion to dismiss. Banks' sole argument in favor of dismissal was that the evidence was insufficient because certain testimony presented by the State was not reliable. We conclude that the credibility of witnesses was for the jury to decide and that therefore, the court did not err when it overruled Banks' motion to dismiss.
Banks moved the court to dismiss the charges against him at the close of the State's evidence; he renewed the motion at the close of all the evidence. The court overruled both motions. Banks argued that the charges should be dismissed, because the testimonies of Young, Montgomery, Casebier, and Bowling were not reliable and therefore, there was not sufficient evidence to support a conviction. Banks makes the same argument on appeal.
[14] Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. State v. McGhee, 274 Neb. 660, 742 N.W.2d 497 (2007). Furthermore, we have stated that the credibility and weight of witness testimony are for the jury to determine, and witness credibility is not to be reassessed on appellate review. State v. Archie, 273 Neb. 612, 733 N.W.2d 513 (2007). The credibility of the witnesses in this case was thus for the jury to decide, and it would not have been proper for the court to grant a dismissal based on its own determination of whether their testimony was reliable. The record shows that if the jury believed the testimonies of Young, Montgomery, Casebier, and Bowling, such evidence supported the charges against Banks. Although Banks presented evidence which might have called each witness' credibility into question, the credibility assessment was a matter for the jury to decide. We conclude that the district court did not err when it overruled Banks' motion to dismiss.

CONCLUSION
Having rejected Banks' assignments of error, we affirm Banks' convictions and sentences for first degree murder and use of a firearm to commit a felony.
Affirmed.
HEAVICAN, C.J., not participating.